

**19 - 3 9 3 2 JMC**

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Task Force Officer Daniel DeLorenzo, being duly sworn does depose and state the following:

### A.  INTRODUCTION

1.  I make this affidavit in support of an application for a criminal complaint: charging Christopher JERRY with possession with the intent to distribute cocaine base and 100 grams or more of heroin, in violation of 21 U.S.C. § 841(a), and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c).

### B.  AFFIANT

2.  I am a detective with the Anne Arundel County Police Department. Since March, 2014, I have served as a Task Force Officer with the Department of Justice, Federal Bureau of Investigation (DOJ/FBI) with the Baltimore Safe Streets Task Force (SSTF).

3.  The statements made in this Affidavit are based in part on: (a) my personal participation in this investigation; (b) information provided to me by other law enforcement officers; (c) criminal history records maintained by various law enforcement agencies; and (f) the training and experience of myself and other law enforcement agents and officers.

4.  Since becoming a law enforcement officer, I have participated in numerous investigations of unlawful drug trafficking, and have conducted or participated in surveillances, the execution of search warrants, the recovery of substantial quantities of narcotics and narcotics paraphernalia, and the debriefing of informants and cooperating witnesses. I have also reviewed taped conversations, as well as documents and other records relating to narcotics trafficking and money laundering. Through my training, education and experience, I have become familiar with

Case 1:19-cr-00575-CCB   Document 1-1   Filed 11/26/19   Page 2 of 7

19 - 3 9 3 2 JMC

the manner in which illegal drugs are transported, stored, and distributed; the methods of payment for such drugs; the possession and use of firearms in connection with the trafficking of such drugs; and the manner in which narcotics traffickers store and conceal the proceeds of their illegal activities.

5. Through instruction and participation in investigations, I have become familiar with the manner in which narcotics traffickers conduct their illegal business, and the methods, language, and terms which are used to disguise conversations about narcotics activities.

6. From experience and training, I have learned that narcotics traffickers frequently use cellular telephones to further their illegal activities by, among other things, remaining in constant or ready communication with one another without restricting either party to a particular location at which they might be subject to physical surveillance by law enforcement authorities.

7. I also have learned that narcotics traffickers rarely refer to heroin, cocaine, cocaine base (also known as crack), phencyclidine (PCP), or other illegal drugs expressly by name. Instead, to conceal the true nature of their illegal activities and to thwart detection by law enforcement, narcotics traffickers routinely refer to drugs, drug quantities, and drug prices by using seemingly innocuous words or phrases.

8. I also know that drug traffickers frequently have access to several cellular telephones and that they periodically use newly acquired cellular telephones, all in an effort to avoid detection and to avert law enforcement efforts. I also know that drug traffickers communicate by use of text messaging to discuss types, quantities, prices of narcotics, as well as to discuss meeting locations, all in an effort to elude detection and to impede the efforts of law enforcement.

9. As a result of my training and experiences in narcotics-related investigations, I know that it is common for drug dealers and individuals to conceal contraband, proceeds of drug sales and records of drug transactions in secure locations within their residence, vehicles, and/or their business for ready access and to conceal proceeds from law enforcement and rival narcotics traffickers. Additionally, I am aware that drug traffickers often use vehicles, including vehicles registered in the names of others and/or rental vehicles, to transport narcotics to their customers.

10. Additionally, based on my training and experience and participation in other narcotics investigations, I know that it is common for drug dealers to be armed for the protection of themselves, their organization and also of their controlled substances. I further know that it is common for drug dealers to conceal contraband, firearms, proceeds of drug sales, and records of drug transactions in secure locations within their residences, vehicles and/or businesses for ready access and that it is common for drug dealers to conceal proceeds from law enforcement authorities and rival narcotics traffickers.

11. Because this Affidavit is being submitted for the limited purpose of establishing probable cause for a criminal complaint, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. I have not, however, excluded any information known to me that would defeat a determination of probable cause.

**B. PROBABLE CAUSE**

12. In 2015, the FBI began an investigation into a violent drug trafficking organization ("DTO") selling cocaine, heroin and fentanyl in Baltimore City. Known as 'Trained to Go" organization ("TTG"), this DTO included, among others, Roger TAYLOR, a/k/a "Milk", and

19 - 3 9 3 2 JMC

Montana BARRONETTE, a/k/a "Tana." Based on evidence gathered to date, investigators believe that HARRISON, a/k/a "YGG Tay" was a source of supply of cocaine and heroin/fentanyl to TTG. Several members of the TTG organization, including BARRONETTE were charged and found guilty of racketeering.

13. Pursuant to this ongoing investigation, investigators interviewed confidential sources about the activities of HARRISON. During the investigation at least one confidential source ("CS-1")[1] described HARRISON as a cocaine supplier to individuals in Baltimore since as early as 2007.

14. While conducting their investigations, investigators learned that 111 W. Heath Street, Baltimore, Maryland, was an address that HARRISON frequented. On October 7, 2019, investigators from the FBI Safe Streets task force served a subpoena to the leasing office for the apartment building of 111 W Heath Street, Baltimore, Maryland 21230. A rent roll was obtained showing 61 units. Analysis of the rent roll showed that the occupant of Apartment 513 is "Talaya KIRKLAND". A search of MVA records showed that KIRKLAND used another address of 8818 Greens Lane in Randallstown, Maryland 21133. Investigators are aware that the address of 8818 Greens Lane is also an address used by Christopher JERRY. Motor Vehicle records show that JERRY lists the address of 8818 Greens Lane as his home address. During the investigation, investigators learned that JERRY was a close associate of HARRISON.

---

[1] CS-1 is a duly registered informant with BPD and FBI. CS-1 is a credible and reliable source of information that has been registered with FBI and the BPD. CS-1 has been paid for his/her cooperation in the past and is cooperating in hopes of receiving additional payment. CS-1 has prior convictions for second-degree assault.

19 - 3 9 3 2 JMC

15.     On November 22, 2019, the Honorable Beth P. Gesner authorized search and seizure warrants for 111 W. Heath Street Apartment 513, Baltimore, Maryland 21230, and the person of Christopher JERRY.

16.     Upon executing the search warrant at 111 W. Heath Street, Apartment 513, Baltimore, Maryland investigators saw Christopher JERRY in the front living room near the couch before he (JERRY) fled to the bedroom. After being read his *Miranda* rights and acknowledging that he understood them, JERRY told investigators that there was a firearm on the living room couch. Investigators quickly located a Smith and Wesson M&P 9 mm serial number DVT5823 loaded with 16 rounds including one in the chamber on the couch. Additionally, investigators located a Beretta .25 caliber serial number B54043 loaded with 5 rounds in a kitchen drawer next to the refrigerator. After further search of the apartment, investigators located the following in the kitchen:

    a.     Plastic Manitol container containing suspected heroin (field tested positive for heroin) weighing approximately 488 grams (found in bottom right cabinet of kitchen);

    b.     Several clear plastic bags containing suspected cocaine weighing a total of approximately 40 grams (kitchen cabinet over refrigerator);

    c.     Clear plastic bag containing gray rock like substance to wit: suspected heroin (field tested positive for heroin) weighing approximately 51.3 grams (kitchen cabinet over refrigerator);

    d.     Clear plastic bag containing off white rocklike substance, to wit: suspected crack cocaine weighing approximately 28.1 grams (kitchen cabinet over refrigerator)

5

19 - 3 9 3 2 JMC

  e. A sifter, two mixing bowls, a pestle and a credit card of Christopher JERRY with white powder residue (bottom right kitchen cabinet); and

  f. one plastic containing an unknown white powder (kitchen cabinet over refrigerator).

17. I believe through my training, knowledge and experience that the quantity of suspected cocaine, crack cocaine and heroin were all indicative of distribution and exceeded the amount that would constitute personal use. Additionally, your affiant believes that the presence of the sifters, mixing bowls and pestle were evidence of the preparing and manufacturing of narcotics.

18. Additionally, I have spoken with an expert with the Bureau of Alcohol, Tobacco, and Firearms, and now know that the Smith and Wesson M.&P 9 mm serial number DVT5823 loaded with 16 rounds and the Beretta .25 caliber serial number B54043 loaded with 5 rounds, are firearms under federal law.

19. Furthermore I am aware that drug traffickers will regularly keep firearms at stash locations for both offensive and defensive reasons and it is common for members of a drug trafficking organization to share firearms and pass them among other members of the conspiracy as needed. Given this and the proximity of the guns in the apartment to the suspected controlled substances, I believe that JERRY possessed the firearms recovered in furtherance of his possession with the intent to distribute the controlled substances found in the apartment.

**D. CONCLUSION**

20. To the best of my knowledge and belief, all statements made in this affidavit are true and correct. Based on the foregoing facts I believe probable cause exists supporting the issuance of a Criminal Complaint charging the Defendant with possession with the intent to

19-3932 JMC

distribute cocaine base and 100 grams or more of heroin, in violation of 21 U.S.C. § 841(a), and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c).

_____
Daniel S. DeLorenzo
Task Force Officer, FBI

Sworn to and subscribed before me this ___ day of November, 2019

_____
The Honorable J. Mark Coulson
United States Magistrate Judge

FILED ___ ENTERED
LOGGED ___ RECEIVED
NOV 26 2019
AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ___ DEPUTY